**In re David Eugene WHITAKER, Sharron Byrd Whitaker, Debtors.**

**Bankruptcy No. 3–87–02451.**

United States Bankruptcy Court, E.D. Tennessee.

April 18, 1988.

Jerry S. Jones, Johnson City, Tenn., for Hamilton Bank of Upper East Tennessee.

William S. Nunnally, Greeneville, Tenn., for debtors.

RICHARD S. STAIR, Jr., Bankruptcy Judge.

Hamilton Bank of Upper East Tennessee (Bank), a secured creditor, seeks relief from the automatic stay of § 362(a)(5) of title 11 in order to obtain possession of a 1983 Toyota Tercel automobile owned by one of the debtors, Sharron Byrd Whitaker.[1] The Bank also seeks an allowance of attorney's fees. Debtors, having continued to make voluntary payments to the Bank subsequent to the filing of their bankruptcy petition, contend the automatic stay should not be vacated and, notwithstanding termination of the stay, that the Bank has no recourse against the Toyota as the debtors are not in default on their payments. Debtors further dispute the Bank's claim of an entitlement to attorney's fees. All facts and relevant documents are before the court upon "Agreed Stipulations Of Fact" filed by the parties on April 11, 1988.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(G) (West Supp.1987).

## TERMINATION OF AUTOMATIC STAY

### I

It is undisputed that the Bank has a validly perfected security interest in the 1983 Toyota. Equally undisputed is the fact that the automatic stay of § 362(a)(5) will ultimately be terminated as to this vehicle, if not by order of the court then by operation of law upon the granting of the debtors' discharge.[2] The court has withheld granting the discharge pending resolution of the issues raised in this contested matter.

The ultimate issue for resolution by the court is not termination of the automatic stay, but whether the debtors, by continuing to make their contractual installment payments to the Bank subsequent to filing their bankruptcy petition, have a right to possession of the Toyota upon termination of the automatic stay superior to the right of the Bank to repossess this vehicle under a security agreement.

### II

The purchase price of the 1983 Toyota was financed by debtors under the terms of

---

1. Section 362(a) provides in material part:

    (a) Except as provided in subsection (b) of this section, a petition filed under section 301 ... of this title ... operates as a stay, applicable to all entities, of—

    . . . .

    (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

    . . . .

    (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title[.]

    11 U.S.C.A. § 362(a) (West 1979 & Supp.1988).
    The Toyota was abandoned by the trustee on November 23, 1987, and is no longer an asset of the debtors' estate protected by the automatic stay of § 362(a)(3). See 11 U.S.C.A. § 362(c)(1) (West 1979), quoted infra at n. 2.

2. Section 362(c) of title 11 provides in material part:

    (c) Except as provided in subsections (d), (e), and (f) [not applicable herein] of this section—

    (1) the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate; and

    (2) the stay of any other act under subsection (a) of this section continues until the earliest of—

    . . . .

    (C) if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied.

    11 U.S.C.A. § 362(c) (West 1979 & Supp.1988).

a "Note, Security Agreement and Disclosure Statement" (Agreement) executed October 18, 1985.[3] The Agreement granted the Bank a security interest in the Toyota and obligated debtors to pay the principal amount of their indebtedness, $4,111.60, together with finance charges in thirty-six equal monthly installments of $137.45 each commencing November 15, 1985. The Agreement, in addition to other provisions, contains a default clause which provides in material part:

> DEFAULTS. If Debtor has given false or misleading information on warranties or covenants, or subsequently has breached such warranties or covenants, or if any proceedings are instituted by or against Debtor under any state insolvency law, or for the appointment of [a] receiver for Debtor, or if Debtor should make an assignment for the benefit of creditors or becomes insolvent, or fails to furnish or pay for the insurance as provided by this contract, or fails to pay promptly when due any portion of the indebtedness secured hereby, or should Bank for any reason deem itself insecure, then, in any such event Debtor shall be in default hereunder.... Upon default all sums secured hereby shall become immediately due and payable, whether due according to its face or not, at Bank's option, without notice to Debtor, and Bank, its agent or attorney, with or without legal process, may enter any premises wherein the collateral may be found and take possession thereof without notice to the Debtor, and without any liability whatsoever to the Debtor by reason of such entry....

On October 9, 1987, the date the debtors filed their joint voluntary petition under Chapter 7, the value of the Toyota approximated $2,700. Also, the debtors' obligation to the Bank under the Agreement had been reduced to $1,770.45,[4] and all monthly installment payments required by the Agreement were current. The trustee found no value in the Toyota for the benefit of creditors and abandoned the estate's interest. Subsequent to filing their petition debtors continued to make their $137.45 monthly installment payments to the Bank.

### III

The Bankruptcy Code establishes two methods by which a debtor may retain possession of certain secured property: redemption or reaffirmation. Bankruptcy Code § 722, authorizing redemption, provides:

> An individual debtor may, whether or not the debtor has waived the right to redeem under this section, redeem tangible personal property intended primarily for personal, family, or household use, from a lien securing a dischargeable consumer debt, if such property is exempted under section 522 of this title or has been abandoned under section 554 of this title, by paying the holder of such lien the amount of the allowed secured claim of such holder that is secured by such lien.

11 U.S.C.A. § 722 (West 1979). Reaffirmation is authorized by Bankruptcy Code § 524(c) which provides in material part:

> (c) An agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title is enforceable only to any extent enforceable under applicable nonbankruptcy law, whether or not discharge of such debt is waived, only if—
>
> (1) such agreement was made before the granting of the discharge under section 727, 1141, 1228, or 1328 of this title;

---

**3.** Although the Toyota is titled solely in Mrs. Whitaker's name, both debtors executed the Agreement and, pending discharge, are liable to the Bank for the indebtedness created thereunder. The Agreement represents a consumer transaction.

**4.** Debtors, in Schedule A–2 of their petition, erroneously schedule the loan balance at the time of bankruptcy in an amount equal to the value of the Toyota, $2,700. The parties in their written stipulations incorrectly stipulate that debtors claimed their equity in the Toyota as exempt. This is not correct: no equity in the Toyota was scheduled and no equity was claimed exempt.

(2) such agreement contains a clear and conspicuous statement which advises the debtor that the agreement may be rescinded at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later, by giving notice of rescission to the holder of such claim;

(3) such agreement has been filed with the court and, if applicable, accompanied by a declaration or an affidavit of the attorney that represented the debtor during the course of negotiating an agreement under this subsection, which states that such agreement—

(A) represents a fully informed and voluntary agreement by the debtor; and

(B) does not impose an undue hardship on the debtor or a dependent of the debtor;

(4) the debtor has not rescinded such agreement at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later, by giving notice of rescission to the holder of such claim;

(5) the provisions of subsection (d) of this section have been complied with[.]

11 U.S.C.A. § 524(c) (West Supp.1988).

In summary, § 722 permits a debtor to redeem tangible secured personal property from a lien securing a consumer debt upon a lump-sum payment to the creditor of the fair market value of the property or the amount of the claim, whichever is less. Redemption may be voluntary, upon agreement of the debtor and secured creditor stipulating the redemption value of the secured property, or involuntary.[5] Reaffir-

mation, on the other hand, always contemplates a voluntary agreement between the debtor and a creditor.

Discussing the alternatives of redemption under § 722 and reaffirmation under § 524(c), the Court of Appeals for the Sixth Circuit has stated:

Section 524(c) authorizes a Chapter 7 debtor to seek renegotiation of the terms of the security agreement with a creditor thereby creating an alternative method pursuant to which a debtor may attempt to retain possession of secured collateral. Such an alternative, obviously attractive to the debtor financially unable to redeem the secured collateral through a lump-sum payment, is the equitable complement to § 722. Simply, a debtor incapable or unwilling to tender a lump-sum redemption and redeem the secured collateral for its fair market value may reaffirm with the creditor; contrawise, a debtor confronted with a creditor unwilling to execute a renegotiation may retain the secured collateral by redeeming it for its fair market value, which value may be substantially less than the contractual indebtedness. However, § 524(c) facially contemplates that the creditor, for whatever reason, may reject any and all tendered reaffirmation offers; § 524(c) envisions execution of an "agreement" which, by definition, is a voluntary undertaking. . . .

*Gen. Motors Acceptance Corp. v. Bell (In re Bell)*, 700 F.2d 1053, 1056 (6th Cir.1983) (citation omitted).[6]

■ The debtors in the case sub judice have neither sought to redeem the 1983 Toyota from the lien of the Bank nor have they sought to negotiate a reaffirmation of the terms of the Agreement. Debtors instead posit that they are not required to redeem the Toyota or reaffirm notwith-

---

**5.** Fed.R.Bankr.P. 6008 provides:

Redemption of Property from Lien or Sale
On motion by the debtor, trustee, or debtor in possession and after hearing on notice as the court may direct, the court may authorize the redemption of property from a lien or from a sale to enforce a lien in accordance with applicable law.

**6.** The *Bell* court considered § 524(c) as originally enacted by the Bankruptcy Reform Act of 1978. The Bankruptcy Amendments and Federal Judgeship Act of 1984 substantially revised the reaffirmation procedures of the 1978 Act. Notwithstanding the 1984 Amendments, it is this court's opinion that the principles enunciated in *Bell* remain as applicable today as they were in 1983.

standing that the indebtedness secured by the Toyota will be discharged and the stay under § 362(a)(5) terminated. Debtors contend they are entitled to remain in possession of the Toyota so long as they continue to make their $137.45 monthly installments in accordance with the payment terms of the October 18, 1985, Agreement.

The court is urged by these debtors to accept the same argument advanced before the Sixth Circuit in *Bell, supra:* that their right to continued possession of the 1983 Toyota emanates from the Agreement and that they enjoy the same rights after abandonment as before the filing of their bankruptcy petition, including the right to continue monthly payments so long as no default intervenes.[7] In response to this argument, the *Bell* court, quoting with approval *In re Cruseturner*, 8 B.R. 581 (Bankr.D. Utah 1981), stated:

> [I]t has been recognized that a return of abandoned property to the party with the primary possessory interest (usually the debtor) merely provides that debtor with time to enforce his right to redeem the property under § 722 or to seek a reaffirmation of the agreement under § 524(c). The automatic stay of 11 U.S.C. § 362(a)(5) continues in effect, and prevents repossession by the creditor until the case is closed, dismissed, or discharge is granted or denied pursuant to 11 U.S.C. § 362(c)(2). Analyzing the relationship between § 362(a)(5) (debtors protection of the automatic stay) and § 554 (abandonment), the Court in *In re Cruseturner* has summarized:

> > Accordingly, Section 362(a)(5) grants the debtor time to enforce rights in his property given him under Sections 722 and 524(c).

> > The effect of Section 362(a)(5) is to provide the debtor with separate protection of his property. This enables him to exercise his right to redeem

either by acquiring refinancing or by otherwise gathering the necessary funds, or to negotiate a reaffirmation. Unless earlier relief is requested by the creditor, the creditor may not repossess property, despite any abandonment by the trustee, until one of the three acts specified in Section 362(c)(2) occurs ... The application of Section 362 to exempt property and abandoned property is co-extensive with the redemption right given in Section 722, for this right extends to exempt property as well as to non-exempt property which may be abandoned by the trustee. Likewise, the stay will cover property which may be the subject of reaffirmation agreements.

8 B.R. at 592.

*In re Bell, supra,* at 1057–58.

The *Bell* court further noted that a serious issue existed as to whether the debtors before it held the primary possessory interest in a Van upon abandonment in view of a bankruptcy default clause contained in their security agreement.[8] The court held that the bankruptcy default clause became operative once the Van had been abandoned from the estate, and that the debtors were in default of their security agreement and "therefore no longer entitled to the primary possessory interest in the Van." *In re Bell, supra,* at 1058.

The Sixth Circuit in *Bell,* further addressing the debtors' argument that no default had occurred under the terms of their security agreement, held:

> [A] discharge of the debtor's personal liability on the security agreement through bankruptcy constructively vitiated Paragraph 6 of the security agreement which provides that "buyer shall be liable for a deficiency." Negation of the creditor's right to seek personal liability precipitated a default so as to empower

---

7. The debtors, however, have a very narrow definition of default. They contend that default, under the authority of *Bell,* can be considered only within the context of a bankruptcy default clause or nonpayment of the contractual amount required under the Agreement. As payments to the Bank are current and the Agreement contains no bankruptcy default clause, debtors assert there has been no default. *Bell* does not lend itself to so narrow a construction.

8. The security agreement provided that GMAC, the secured creditor, was authorized to immediately repossess its collateral upon the filing of a bankruptcy petition.

GMAC with the primary possessory right to the Van.

In sum, this Court concludes that *redemption and reaffirmation constituted the exclusive methods pursuant to which the Bells could retain possession of the secured collateral.* *In re Bell, supra,* at 1058 (emphasis added).

The conclusions reached by the Sixth Circuit in *Bell* are both equitable and in accord with the dictates of the Bankruptcy Code. For this court to hold that these debtors, by continuing to make uninterrupted installment payments, are able to hold the Bank at bay after the Toyota has been abandoned and the debtors discharged, is to empower debtors with an unorthodox form of "cram-down" in a Chapter 7 case. Such a procedure is not sanctioned under Chapter 7 of the Bankruptcy Code.[9]

■ Further, debtors' argument that they have not defaulted under the terms of the October 18, 1985, Agreement will not bear scrutiny. The "DEFAULTS" provision of the Agreement provides several means of default, including failure to make prompt payments, lack of insurance, insolvency, and deemed insecurity on the part of the Bank. These debtors cannot seriously contend that the filing of their Chapter 7 bankruptcy petition was anything less than an overt declaration of insolvency;[10] nor can debtors persuasively argue that the Bank does not deem itself insecure at this point in the proceedings.[11] Not only are the debtors presently in default under the provisions of the October 18, 1985, Agree-ment, their future default is inevitable: upon the grant of a discharge, the debtors' personal liability for a deficiency will be discharged, thus, as stated by the Sixth Circuit, "precipitat[ing] a default so as to empower [the Bank] with the primary possessory right to the [Toyota]." *In re Bell, supra,* at 1058.[12]

Finally, it would be wholly inequitable for the court to accept debtors' premise that they retain the primary possessory interest in the Toyota by continuing to make monthly payments to the Bank. Debtors would have the best of both worlds: a discharge of their indebtedness and unhindered use of the Bank's collateral for so long as the debtors, in their discretion, chose to continue making payments. Proper care of the Toyota would be subject to the whim of the debtors: they might waste the vehicle through improper maintenance or use, thus causing excessive depreciation in a short period of time, while the Bank could do nothing but stand idly by hoping the debtors would default on a payment. Should such a default occur, the Bank would be left with the residual value, if any, in its collateral.

■ This court must adhere to the principles espoused by the Sixth Circuit in *Bell, supra:* redemption or reaffirmation are the exclusive methods by which debtors under Chapter 7 may retain possession of secured property. Upon abandonment from the estate by the trustee and termination of the automatic stay of § 362(a)(5), a secured creditor whose collateral has not been redeemed or is the subject of a reaffirmation

---

**9.** The scheduled unsecured debts of these debtors exceeds the $100,000 Chapter 13 eligibility requirement of 11 U.S.C.A. § 109(e) (West 1979). Had Chapter 13 relief been available, the debtors could have exercised their right to "cram-down" the Bank over its objections under the provisions of 11 U.S.C.A. § 1325(a)(5)(B) (West 1979 & Supp.1988). Chapter 11 may also afford a debtor the right to "cram-down" a secured creditor. *See* 11 U.S.C.A. § 1129(b)(2)(A)(i) (West Supp.1988).

**10.** The debtors' schedules filed October 9, 1987, reflect assets with a value of $84,680 and liabilities totalling $1,398,626. Debtors are insolvent within the meaning of 11 U.S.C.A. § 101(31) (West Supp.1988).

**11.** It is also noteworthy that on December 7, 1987, the Bank was required to expend $237 to "force write" insurance when the debtors allowed their policy on the Toyota to lapse. On April 5, 1988, upon proof of insurance, the Bank cancelled its policy effective back to February 19, 1988.

**12.** The "DEFAULTS" clause of the Agreement also provides for personal liability of the debtors for any deficiency arising after application of the sale proceeds of the Toyota to the indebtedness.

agreement has a right of possession in the secured property superior to the right of the debtor to continued possession.[13]

In light of the court's holding in this matter, the Whitakers will be afforded an opportunity to reevaluate their decision not to redeem the Toyota or negotiate a reaffirmation of their Agreement with the Bank. The automatic stay will remain in effect pending the granting of the debtors' discharge. A discharge hearing date will be set by appropriate order.

## ATTORNEY'S FEES

■ The Bank asserts its entitlement to attorney's fees under the Agreement. Debtors contend the only provision in the Agreement relative to attorney's fees is found in a clause entitled "ACCELERATION" which provides in material part:

ACCELERATION. If Debtor fails to make any payment on time, Bank may declare the entire unpaid amount, less unearned interest, immediately due and payable without notice. Bank's acceptance of payments after default, or after notice of acceleration, shall not re-instate the installment payment schedule or otherwise preclude acceleration unless Bank so agrees in writing.... If placed in the hands of an attorney for collections, all such parties jointly and severally agree to pay all costs of collection, including reasonable attorney's fees and Court costs.

Debtors contend that the Bank can only recover its attorney's fees upon default of an installment payment. They are incorrect. A "MISCELLANEOUS" provision of the Agreement provides, inter alia: "If this note is not paid as agreed, Maker agrees to pay all costs of collection, including a reasonable attorney's fee...." Additionally, the "DEFAULTS" provision of the Agreement provides that the proceeds from any sale of the Bank's collateral, "less expense[s] ... and attorney's fees, if any,

shall be credited to the indebtedness." The Bank's efforts to obtain possession of its collateral in the bankruptcy court entitle it to attorney's fees under the Agreement.

Section 506(b) of the Bankruptcy Code provides:

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C.A. § 506(b) (West Supp.1988).

The United States Bankruptcy Appellate Panel of the Ninth Circuit has recently noted:

Although section 506(b) does not use the specific language of "attorney's fees," the legislative history "make[s] it quite clear that attorneys [sic] fees and costs that are agreed to by contracting parties are to be allowed an oversecured claimant regardless of contrary law." *In re Carey*, 8 B.R. 1000, 1004 (Bankr.S. D.Cal.1981)....

Thus, under section 506(b) four elements must be met in order to recover attorney's fees when bringing a motion to lift the automatic stay: 1—it is an allowed secured claim; 2—the creditor is "oversecured;" 3—the fees are "reasonable" under the circumstances; and 4—the fees are provided for under the agreement.

*Meritor Mortgage Corp., West v. Salazar (In re Salazar)*, 82 B.R. 538, 540 (9th Cir.B. A.P.1987).

In the instant case, it is undisputed that the Bank is an oversecured creditor holding an allowed secured claim and that the Agreement provides for attorney's fees. The only issue for determination by the court is the reasonableness of those fees.

---

**13.** The court is cognizant of the provisions of Code § 524(f): "Nothing contained in subsection (c) or (d) of this section prevents a debtor from voluntarily repaying any debt." 11 U.S.C.A. § 524(f) (West Supp.1988). Just as a debtor may make voluntary payments postpetition, a secured creditor may accept such payments; however, voluntary postpetition payments do not re-obligate a debtor on the original debt absent compliance with § 524(c); nor is the secured creditor, by accepting voluntary payments, deprived of its right to repossess the secured collateral upon termination of the stay.

The parties have stipulated that the attorney for the Bank has performed ten (10) hours of legal services through March 29, 1988, in prosecuting the Bank's efforts to obtain relief from the automatic stay and that the attorney's hourly rate of $70 is reasonable. Thus, the Bank seeks $700 in attorney's fees from the debtors under the Agreement.

The court is of the opinion that under the circumstances of this proceeding the debtors should not be required to shoulder the entire responsibility for the Bank's attorney's fees. The issues raised by the parties are not those normally encompassed within an automatic stay motion. The parties advised the court at the outset that they were seeking guidance as to the ability of Chapter 7 debtors in the Northern and Northeastern Divisions of this District to retain possession of secured property against the wishes of a secured creditor solely by continuing to make voluntary postpetition installment payments. This Memorandum has hopefully provided that guidance.

The court finds that the Bank is entitled to recover reasonable attorney's fees from the debtors in the amount of $350.

This Memorandum constitutes findings of fact and conclusions of law as required by Fed.R.Bankr.P. 7052.